

2015 JUL 13 A 11: 24

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of:<br>BRADLEY B. WARD<br><br><br>STATE OF WASHINGTON,<br><br>Petitioner,<br><br>v.<br><br>BRADLEY B. WARD,<br><br>Respondent. | NO. 71930-1-I<br><br>DIVISION ONE<br><br><br><br><br><br>UNPUBLISHED OPINION<br><br>FILED: July 13, 2015 |

LAU, J. — The State appeals the trial court's order denying its motion to revoke conditional release for Bradley Ward, a sexually violent predator who was civilly committed to the Special Commitment Center on McNeil Island in 1991 under RCW 71.09. Because the trial court's ruling falls well within its broad discretion, we conclude that no manifest abuse of discretion occurred when it denied the State's motion to revoke Ward's conditional release. Accordingly, we affirm.

## FACTS

Bradley Ward's history of sexual deviancy began at approximately age 14. As a teenager, his misconduct included indecent exposure, voyeuristic behavior, and sexual acts with his younger brother and female cousins. When he was 16, he was struck by a car and suffered a traumatic brain injury that affected his ability to regulate his psychological and emotional behaviors, thereby exacerbating his deviancy. In 1991, when Ward was 19, he was civilly committed under RCW 71.09 as a sexually violent predator by a stipulated order. Since then, he has resided primarily in the Special Commitment Center (SCC), a secure facility operated by the Department of Social and Health Services on McNeil Island.

In 2007, Ward petitioned for, and was granted, an unconditional release trial. A jury found, however, that Ward continued to meet the definition of a sexually violent predator, and his unconditional release was denied. Nevertheless, due to Ward's success in sexual deviancy treatment, the parties agreed to release Ward to a less restrictive alternative (LRA). Consistent with the parties' agreement, the court ordered Ward be transferred to the Secure Community Transition Facility (SCTF), a less restrictive facility also located on McNeil Island. While at the SCTF, Ward received specific sex offender treatment from Dr. Mark Whitehill, who updated the court monthly.

While residing at the SCTF, Ward made significant progress with Dr. Whitehill. Ward regularly engaged in both group and individual therapy sessions with Dr. Whitehill. Throughout Dr. Whitehill's monthly reports between 2007 and 2012, he consistently assessed Ward as a low risk to reoffend. Dr. Whitehill's reports document the frequency of Ward's therapy sessions in addition to describing Ward's behavior and

-2-

thoughts. Generally, Dr. Whitehill described Ward as demonstrating well-controlled conduct. Dr. Whitehill generally noted that Ward exhibited no deviant indicators—suicidal thoughts; preoccupation with masturbation; aggressive behavior; sexual fantasies involving manipulation, coercion, or violence; or lack of personal hygiene. Ward was also allowed to go on off-island outings supervised by SCTF staff. For the first time in 21 years, staff believed Ward might be ready to move to transitional housing in the community (i.e., off-island).

But by the end of 2011 and in early 2012, Ward's mental state deteriorated. Ward began exhibiting delusions and paranoia. Throughout 2012, Ward was moved several times from the SCTF to the SCC and back again. The State filed a motion to formally revoke Ward's 2007 LRA order allowing him to live in the SCTF.

In February 2012, Ward was transferred back to the SCC due to his mental instability. One therapist noted that Ward was usually able to "talk his way through" his paranoid delusions, but in early 2012 he seemed unable to do so. Clerk's Papers (CP) at 183. For example, he expressed a belief that the SCC was a CIA operation and that a metal pin on a staff member's badge was a camera filming him. Dr. Whitehill and other members of the clinical staff believed moving Ward to the SCC would allow more adequate monitoring of his medications. Dr. Whitehill and Ward's other therapists believed that Ward's mental decline was probably a response to the stress of potentially leaving McNeil Island after residing there for over 21 years.

In late May 2012, the staff moved Ward back to the SCTF. Dr. Whitehill explained that Ward had demonstrated some progress, including an increased ability to recognize certain bizarre thoughts as delusional. Despite the fact that Ward had

"engaged in a number of instances of inappropriate behavior" while at the SCC, Dr. Whitehill and other members of the staff nevertheless believed that Ward would fare better at the SCTF. CP at 311. Specifically, they believed that the environment of the SCC was actually making Ward's psychosis worse: "Among the factors figuring into this decision was the belief that the high-stimulation environment of the SCC was thought to be triggering certain delusions and instances of negative behavior." CP at 311. Notably, even though Ward exhibited some increased delusions, Dr. Whitehill found that Ward's risk of committing a sexually violent offense remained low: "It has been [my] experience of Mr. Ward that during times of mental decompensation his sexual thoughts have diminished significantly." CP at 311.

In late July 2012, Ward was transferred back to the SCC. Although his behavior at the SCTF was generally positive, there was an incident in July where Ward believed someone had poisoned his garlic bread, and "he voiced violent thoughts pertaining to staff and other residents" at the SCTF. CP at 313. Dr. Whitehill maintained that Ward presented a low risk for committing a sexual offense: "Mr. Ward's self-reported sexual thoughts and masturbation have diminished since the onset of more prominent delusional material." CP at 313. Dr. Whitehill did state, however, that Ward's risk of committing an act of general violence was "low-moderate." CP at 314.

Ward was transferred back to the SCTF in September 2012, but was remanded to the SCC in October. As Dr. Whitehill explained, this was "the third such remand since February of this year, all of which have occurred for the same reason: Mr. Ward's mental state deteriorated to the point where concerns arose as to whether he could comport himself safely in the community. It is also believed that the confines of SCC

-4-

enable more careful assessment and management of his psychiatric condition." CP at 1. Ward has resided in the SCC since October 2012.

At the end of 2012, Dr. Whitehill noted that Ward's mental state and behaviors had deteriorated. He experienced increased delusions and deficient personal hygiene:

> Unfortunately since my visit, Mr. Ward's mental health has declined further. Reports from SCC staff communicated to me by Community Programs Administrator Julia Crabbe indicate that Mr. Ward has reported suicidal thinking, he frequently exited his room without clothing, and was defecating seemingly indiscriminately. When confronted about these behaviors, he asserted that he was going "primitive" and needed to do so to be permitted to "time-travel."

CP at 1.

While at the SCC, Ward was frequently placed in the Intensive Management Unit (IMU), the SCC's term for solitary confinement. Dr. Abrams, an expert hired by Ward to review the SCC's documentation and records, found that, between October 24, 2012, and December 11, 2013,—a 413 day period—Ward had been in solitary confinement for a total of 276 days. Dr. Abrams noted that, according to the SCC's own policies, a staff member must document the reasoning for placing a resident in the IMU, and an authorizing entity must evaluate the resident's seclusion every 4 hours or every 72 hours if the period of seclusion lasts longer than 72 hours. But Ward was sometimes placed in seclusion without any documented reason for doing so, and for several terms of seclusion where there was no documentation showing that any regular evaluations of his seclusion ever took place.

On July 3, 2013, the Department of Corrections filed a report with Snohomish County Superior Court alleging Ward had violated the terms of his LRA order. The violation report stated that Ward failed to follow staff directives on multiple occasions

and violated several SCC policies by (1) exposing himself on multiple occasions, (2) failing to maintain personal hygiene standards, (3) being sexually inappropriate with other residents, and (4) giving personal property to another resident. The report details several instances where Ward walked around the SCC naked, was discovered masturbating, urinated or defecated on himself, and two instances where Ward attempted to hug or touch another resident. The report recommended a hearing to address revocation of Ward's LRA.

In January 2014, the State filed a motion to revoke Ward's LRA. The trial court denied the State's motion. In addition to weighing the relevant statutory factors, the court based its decision, at least in part, on the conditions Ward experienced at the SCC and the inference that he might fare better at the SCTF:

> I will tell you this is a pretty close call. In terms of Mr. Ward's best interest, I think it would be in his best interest to stay at the SCTF, because he would be able to get help for his problems. He's not getting any of that when he's at the SCC, and I'm very concerned that he's stuck in IMU. I understand he's there for his own protection, but the reality is putting people in solitary confinement just makes them worse and worse and worse and he's not getting any kind of help.
>
> As far as I understand the logic behind putting people in the SCC, it's for them to get treatment and for the community to be protected. What I'm going to do is I'm not going to revoke the less restrictive alternative. And let me tell you why I'm doing that, and I hadn't made up my mind until I heard the arguments and until I kind of went through those factors, but my concern is, number one, that putting Mr. Ward in solitary isn't going to solve any problem except maybe make things easier for people at the SCC and SCTF. But ultimately, if the idea is to protect the public from Mr. Ward, they're not going to be protected by putting him in solitary confinement and just warehouse him there and essentially not giving him any treatment.

Report of Proceedings (RP) (May 7, 2014) at 26.

Accordingly, the trial court denied the State's motion and ordered that Ward be transferred back to the SCTF within 45 days. We stayed that order and granted the State's request for discretionary review.

## ANALYSIS

### Standard of Review

The parties agree that the trial court's decision here is reviewed for an abuse of discretion. A trial court abuses its discretion if its decision "is manifestly unreasonable or based upon untenable grounds or reasons." State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard." In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). An abuse of discretion will be found only when no reasonable judge would have reached the same conclusion. It is a deferential standard because "the trial judge, 'having seen and heard' the proceedings 'is in a better position to evaluate and adjudge than can we from a cold, printed record'." State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006).

A motion to revoke a conditional release order (LRA) is governed by RCW 71.09.098. A hearing to revoke a conditional release order involves two steps: first, the State must prove "by a preponderance of the evidence that the person has violated or is in violation of the court's conditional release order or that the person is in need of additional care, monitoring, supervision, or treatment." RCW 71.09.098(5)(c). The parties agree that the State has met its burden under the first step.

If the trial court finds that the first step is satisfied, it must then decide whether to revoke the person's conditional release order based on five statutory factors:

(6)(a) If the court determines that the state has met its burden referenced in subsection (5)(c) of this section, and the issue before the court is revocation of the court's conditional release order, the court shall consider the evidence presented by the parties and the following factors relevant to whether continuing the person's conditional release is in the person's best interests or adequate to protect the community:

    (i)    The nature of the condition that was violated by the person or that the person was in violation of in the context of the person's criminal history and underlying mental conditions;

    (ii)    The degree to which the violation was intentional or grossly negligent;

    (iii)    The ability and willingness of the released person to strictly comply with the conditional release order;

    (iv)    The degree of progress made by the person in community-based treatment; and

    (v)    The risk to the public or particular persons if the conditional release continues under the conditional release order that was violated.

(b)    Any factor alone, or in combination, shall support the court's determination to revoke the conditional release order.

RCW 71.09.098(6)(a)–(b) (emphasis added).

Order Denying LRA Revocation

Our review of the record shows that the trial court carefully reviewed the voluminous evidentiary record provided by the State and Ward, including the reports of Ward's treating psychologist, Dr. Mark Whitehill and Dr. Alan Abrams, Ward's expert forensic psychiatrist. The court also "read the briefing . . . a number of statutes and went through the statutes trying to figure out what to do with this case." RP (May 7, 2014) at 22. The court considered the evidence and the statutory factors governing LRA revocation set out in RCW 71.09.098 to determine whether continuing Ward's

-8-

"conditional release is in [his] best interest or adequate to protect the community." RP (May 7, 2014) at 23.

The record further demonstrates that the court thoughtfully analyzed each of the RCW 71.09.098's factors in light of the evidentiary record before it.

The State challenges the court's consideration of each factor by essentially pointing exclusively to the record evidence favoring revocation. It suggests that the trial court ignored evidence favoring revocation. But the record is clear that the trial court also considered equally compelling opposing evidence. Indeed, the trial court described the determination as "a close call." RP (May 7, 2014) at 26. For example, the State argues on appeal that "the trial court, in its oral findings, referenced some of these behaviors, it does not appear to have considered those behaviors in the context of Ward's criminal history or mental condition as required by RCW 71.09.098(1)." Br. of Appellant at 29. But it cites to nowhere in the record to support this speculative assumption.

The State also asserts that when a person's behavior poses a threat to society, whether the violation was willful or not is irrelevant. This assertion implicates the second factor—whether the violation was intentional or grossly negligent.[1]

To support this contention, the State cites In re Detention of Wrathall, 156 Wn. App. 1, 9, 232 P.3d 569 (2010). In Wrathall, the trial court revoked a SVP's conditional release in part because he posed a threat to society. Wrathall, 156 Wn. App. at 5. Wrathall argued that the trial court violated his due process rights when it revoked his

_____

[1] The State challenges this factor even though it acknowledges this factor weighs in favor of Ward.

conditional release without finding that he had willfully violated any specific condition. We affirmed the trial court, stating "Due process requires no finding of willful violation where the violation itself creates a threat to society." Wrathall, 156 Wn. App. at 8-9. The court did not hold that intentionality is irrelevant when the violation itself poses a threat to society. It held that, when the violation creates a threat, the trial court does not violate any due process rights by revoking conditional release without making a specific finding regarding whether the violation was willful. Wrathall, 156 Wn. App. at 9. Whether the violation was intentional may nevertheless be relevant to the court's analysis. See RCW 71.09.098(b) ("Any factor alone, or in combination, shall support the court's determination to revoke the conditional release order.").

Further, Wrathall posed a much more dangerous risk to society than Ward. Wrathall's history of sexual deviancy included acts of kidnapping, sadism, and bondage. Wrathall, 156 Wn. App. at 2. When Wrathall's sex offender treatment provider asked him what he would do to keep the community and children safe should he be allowed to transition to community housing, Wrathall stated "he would try to improve his mood by consuming beer, hard alcohol, and drugs, and if that did not help, he would then 'look for a kid.'" Wrathall, 156 Wn. App. at 5. Wrathall also disliked authority and once told his treatment provider that he would "maybe" molest a minor simply because he was told not to. Wrathall, 156 Wn. App. at 4. Nothing in the record here suggests Ward poses a similarly dangerous risk.

Evidence of Conditions at the SCC

In its reply brief, the State contends the trial court improperly relied on conditions at the SCC in determining not to revoke Ward's LRA. But the State waived this issue, and we therefore decline to address it.

First, the State never sought to exclude specific evidence of the SCC's conditions below.[2] Nor did it assign error to the trial court's decision to consider this evidence. We need not review unassigned errors. RAP 10.3(a)(4); RAP 10.3(g); Unigard Ins. Co. v. Mut. of Enumclaw Ins. Co., 160 Wn. App. 912, 922, 250 P.3d 121 (2011). Second, the State does not address the evidence of the SCC's conditions in its opening brief. "We will not consider an inadequately briefed argument." Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 835 (2011); see also Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration."). Further, the State cites no authority prohibiting consideration of the conditions of confinement in the context of a LRA revocation hearing.[3] See DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may

---

[2] The State did not address this evidentiary concern in its written motion below. In oral argument to the trial court, the State merely asserted that, "an LRA revocation proceeding is not the vehicle by which a respondent can challenge or should challenge the conditions at the SCC. Because the SCC is not ideal for Mr. Ward is not really what this court should be considering when considering the revocation from the SCTF." RP (May 7, 2014) at 21. The State provided no analysis, authority, or record citation to the trial court in support of its assertion.

[3] The State accuses Ward of attempting to turn his revocation hearing into a modification hearing under RCW 71.09.098(7). But the parties agree that section of the statute is not relevant here.

assume that counsel, after diligent search, has found none."). Finally, the State never specifies what evidence of conditions at the SCC the trial court improperly relied on. We decline to speculate as to what evidence the State asserts was improper.[4]

The State fails to demonstrate the trial court manifestly abused its discretion when it applied the statutory factors to the record here. The trial court considered the evidence and the factors and concluded they weighed in favor of denying the State's motion to revoke Ward's LRA. The State does not argue that the trial court applied the incorrect legal standard, nor does it point to any authority mandating the opposite result. Instead, the State essentially asks us to step into the shoes of the trial court and apply the same statutory factors to the same facts the trial court considered and reach a different conclusion. Although the facts arguably could support revocation, they also support no revocation as the trial court concluded. Under these circumstances, we decline to find the trial court's decision was untenable. Indeed, as the trial court noted, this is a "close case," and because the record supports the trial court's ruling, it acted well within its discretion when it denied the State's motion to revoke Ward's LRA.

---

[4] We agree in part with the State's general proposition that a LRA revocation hearing is not the appropriate forum for constitutional "challenges to the condition of confinement" generally. That significant question is not properly before us.

71930-1-I/13

## CONCLUSION

Because the trial court's ruling denying the motion to revoke falls well within its broad discretion, we affirm the order denying the State's motion to revoke Ward's LRA.

WE CONCUR:

-13-